Nov. 1812.

HUNTINGTON
v.
WOLCOTT.

---

HEZEKIAH HUNTINGTON *against* ALEXANDER WOLCOTT.

*W.* issued proposals to procure a title to certain lands in *Virginia*, as agent for such persons as should choose

MOTION for a new trial.

This was an action of *assumpsit.* The declaration stated, that in *June,* 1795, the defendant represented, that he had entered into certain articles of agreement with one *Alexander Smyth,* for the purchase of about 1,500,000 acres of land, in

to employ him for that purpose, at 10 cents per acre. He also, applied to *H.,* and solicited him, as his agent, to aid him in procuring individuals to become purchasers of the lands, on the terms proposed ; and to induce *H.* to undertake such agency, proposed and agreed to allow him one cent for each acre which he should agree to take for himself, or procure to be taken by others, provided the quantity so to be taken, should amount to 100,000 acres. *H.,* as agent of *W.,* proposed to *C.* to become a purchaser of the lands, and communicated to him, the proposals of his principal   Afterwards, *H.* and *C.* met to negotiate on this subject, when *H.* informed *C.,* that the lands were rapidly rising in value, and could not then be procured at 10 cents per acre ; but if *C.* would agree to give 12½ cents per acre, *H.* would engage to procure the land from *W. ;* to which *C.* gave his assent ; and thereupon, *H.,* as the agent of *W.,* entered into articles of agreement for the purchase of 200,000 acres of the lands, at 12½ cents per acre. Afterwards, on the same day, it was agreed between the parties, to vary the terms of the first agreement, and for this purpose *H.,* in his own behalf, and not as the agent of *W.,* executed an agreement, by which he stipulated, that *C.* should have the lands mentioned in the first agreement, at 10 cents per acre, on condition that *C.,* when he should become vested with a title, and should have sold the land, should pay to *H.* one cent per acre, in addition, on 100,000 acres.   *C.* thereupon, in consequence of his contract with *H.,* associated himself with *T.,* as a partner in such contract ; and thereupon, *C.* and *T.,* immediately, adopted measures to complete a contract with *W.,* in pursuance of the agreement between *H.* and *C.*   *C.* and *T.* having, afterwards, ascertained, that the representations of *H.,* in relation to the price of the land, &c. were incorrect, and that *W.* had never demanded more than 10 cents per acre for the land, applied directly to *W.,* and contracted with him for the purchase of 200,000 acres of the land, at 10 cents per acre.   *H.* was present during the whole of this transaction, and was a subscribing witness of the contract : No mention

*Virginia,* upon certain conditions, to the plaintiff unknown; that in the month of *August,* 1795, he offered himself as agent for such persons as were desirous of becoming purchasers of such lands, and proposed to procure for them, from the state of *Virginia,* a title to such lands, at the price of ten cents per acre, for such number of acres as each individual should choose to purchase, payable in the manner following, *viz.* three cents to be advanced on the 6th of *September,* then next; one cent more, on the first day of *January,* 1796; a further instalment of three cents, on the first day of *January,* 1797; and the remaining three cents, on the first day of *January,* 1798, with interest from the first day of *January,* 1797. It was then stated, that on the 22d of *August,* 1795, the defendant applied to, and solicited the plaintiff to aid and assist him in the performance of his contract with *Smyth,* and to undertake to procure individuals to become interested in the purchase of such lands, and to advance to him, the sum of three cents per acre, for such number of acres as they should agree to purchase, and to employ him, as agent, for this purpose, upon the terms before mentioned; and to induce the plaintiff to aid and assist him in this business, the defendant, on the day last mentioned, offered, and engaged to pay the plaintiff, a sum equal to one cent per acre, for all the lands which the plaintiff would take, either for himself, or procure to be taken by others, of the defendant, on the terms above stated; provided the quantity of land so taken, or procured to be taken, should amount, in the whole, to 100,000 acres, and at the same time, executed and delivered to the plaintiff a certain writing, for this purpose.

And it was further stated, that in consideration of the premises, the plaintiff did, at great expence, negotiate with

was made, at this time, of the contract between *H.* and *C.* In an action of *assumpsit* brought by *H.* against *W.,* to recover the amount of one cent per acre on the lands by him contracted to be sold to *C.,* as agent of *W.,* it was held, to be exclusively within the province of the jury to determine, from the facts disclosed on the trial, whether the contract ultimately concluded between *W.,* and *C.* and *T.* for the sale of the land, was effected by the procurement of *H.,* in pursuance of the agreement between him and *W.*—Held, also, that neither the admission of *T.,* as a partner in the contract with *C.,* nor the variance in the terms of the final contract made with *W.,* from the stipulations contained in the original agreement between *H.* and *C.,* could affect the plaintiff's right of recovery.

sundry persons, and procure them to enter into contracts with the defendant, for the purchase of such lands, to the amount of more than 200,000 acres, and to advance to him the sum of three cents on each acre of land so agreed to be purchased, and also, to secure the subsequent payments, according to the terms before stated : And particularly, that the plaintiff procured one *William Coleman* to enter into articles of agreement with the defendant, for the purchase of 200,000 acres of the land in *Virginia*, and that *Coleman*, with others, by the procurement of the plaintiff, did actually advance to the defendant, the sum of 6,000 dollars, being three cents per acre of the lands so contracted for, and did, also, secure to the defendant's satisfaction, the payment of the subsequent instalments, &c.

The cause was tried before the Superior Court, on the plea of *non assumpsit*. The jury found a verdict for the defendant.

On the trial, it was proved, that *Wolcott*, the defendant, on the 22d of *August*, 1795, issued certain proposals, in writing, relating to the purchase and sale of lands in *Virginia*, by which, he offered himself, as agent for such persons as might employ him, for that purpose, to procure for them, titles to a certain tract of land in *Virginia*, containing 1,000,000 acres, at the price of ten cents per acre ; three cents to be paid in advance ; one cent on the 1st of *January*, then next ; the remaining six cents to be without interest for one year ; then three cents to be paid on the 1st of *January*, 1797 ; and three cents more, with interest for one year, to be paid on the 1st of *January*, 1798. But if it should be found, on his arrival at *Richmond*, that the lands were purchased by any other person, the defendant would, immediately, return the money advanced, without deduction, as he expected to receive his compensation in the proposed price of the land, and was willing, for that consideration, to risk the trouble and expences of the journey, &c.

It was also proved, that the defendant executed and delivered to the plaintiff, a certain writing or agreement, in the words following, viz. " Mr. *Wolcott* engages to allow Mr. *Hezekiah Huntington*, one cent per acre, out of the ten

cents to be paid for the *Virginia* lands, which Mr. *Wolcott* is offering to procure for those who will employ him, on all the lands which said *Huntington* shall either take for himself, or procure to be taken of said *Wolcott ;* provided the same shall amount, in the whole, to one hundred thousand acres. *August* 22d, 1795. Test. *Alexander Wolcott.*"

And it was proved further, that in pursuance of such agreement, the plaintiff took for himself, about 6,000 acres of the lands ; and procured *Hinckley* & Co. to become purchasers of 20,000 acres, and one *Smith*, a purchaser of 5,000 acres, more ; and that *William Coleman* and *John Taylor*, on the 6th of *September*, 1795, contracted with the defendant, for the purchase of 200,000 acres.

As by the agreement of the parties, the plaintiff was to receive no compensation, unless the sales by him procured, should amount to 100,000 acres, the decision of the cause depended on the single question, whether the contract with *Coleman* and *Taylor* was made by the procurement of the plaintiff, in such manner as to entitle him to his commission, within the meaning of the agreement?

In relation to this point, *Coleman* testified, that the plaintiff applied to him, and gave him information of *Wolcott's* proposals, and offered, as agent of *Wolcott*, to contract with him for the sale of lands in *Virginia*, to almost any amount, at ten cents per acre ; that he, thereupon, determined to make a large purchase ; but no specific agreement was made, at that time ; that on the 28th of *August*, 1795, he again met the plaintiff, for the purpose of completing the contract, when the plaintiff informed him, that the lands were rapidly rising in value and estimation, and could not be procured at the rate of ten cents per acre, but that if he would give twelve and an half cents per acre, he, the plaintiff, would engage to procure them from the defendant, to which proposition he assented ; that thereupon, the plaintiff, as the agent of *Wolcott*, and himself, entered into a written contract (which was produced on the trial) whereby, among other things, it was stipulated as follows, *viz.* " Whereas the said *Wolcott*, in the month of *June* last past, negotiated, and entered into articles

of agreement with *Alexander Smyth* of the county of *Wythe* and commonwealth of *Virginia*, Esquire, for the purchase of about fifteen hundred thousand acres of land situate in the western part of said commonwealth of *Virginia*, on the river *Sandy*, so called ; and whereas the said *Wolcott* now offers himself, as agent, to procure for such person or persons as have, or shall employ him, titles to said tract of land, at the price, and on the terms herein stated, *viz.* twelve and an half cents per acre, lawful money, payable in the manner following, three cents on each acre, to be advanced to said *Wolcott,* on or before the 6th day of *September* next, and one cent on the first day of *January* next, and the remaining eight and an half cents, without interest for one year, from and after said first day of *January* next, when four cents shall be advanced, and the remaining four and an half cents, on the first day of *January*, 1798, with interest from the first day of *January*, 1797 ; and if, on the said *Wolcott's* arrival at *Richmond* in *Virginia*, the said lands are purchased by any other person, and cannot be by him obtained, in that case, the money advanced, shall be immediately returned, without deduction, said *Wolcott* having his compensation included in the said twelve and an half cents," &c.   " And whereas, a meeting of the proprietors concerned in said purchase, is to be held on the 4th day of *September* next, he will enter into articles, on the principles above stated," &c.   " Now, in consideration that the said *William* doth hereby covenant and agree to advance the sum of 6,000 dollars, being the first advance for 200,000 acres, and to enter into further stipulations with said *Wolcott*, on said 4th day of *September*, at the city of *Hartford*, for the payment of the remaining nine and an half cents, on the terms above stated, the said *Huntington*, on his part, doth hereby covenant and agree with *Coleman*, that he shall have said lands, or that said *Wolcott* shall contract with him for the same, on the principles herein stated," &c.   This agreement was executed by *Coleman*, and *Huntington*, as the agent of *Wolcott*.

*Coleman* also testified, that afterwards, on the same day, it was agreed between him and the plaintiff, to vary the terms

of the contract last recited, and for this purpose, the plaintiff, in his own behalf, and not as agent for *Wolcott,* executed and delivered to him a memorandum of an agreement, by which it was stipulated, that the plaintiff would not demand of him for the land mentioned in the original agreement, more than ten cents per acre ; and that when he, *Coleman,* should make sale of such lands, after the purchase should have been completed, and the title vested in him, he should pay to the plaintiff one cent more per acre, for 100,000 acres of the lands so contracted for ; the additional cent to be paid to the plaintiff, for his own use, on the first day of *January,* 1797.

*Coleman* also testified, that in consequence of making the contract with the plaintiff, he associated with himself one *John Taylor,* as a partner in the contract, and that they immediately proceeded to *Boston,* for the purpose of raising funds to enable them to pay the three cents per acre on the 200,000 acres, which, by the agreement with the plaintiff, was to be paid in advance ; and that they, *Coleman* and *Taylor,* on the 6th day of *September,* 1795, went to *Hartford,* for the purpose of paying the money to *Wolcott,* and completing the business, in pursuance of the contracts entered into between *Coleman* and the plaintiff ; that on his arrival at *Hartford,* he was informed, that the plaintiff's representations, as to the price and estimation of the land, were incorrect, and that *Wolcott* had ever been willing to contract for the sale of lands, for ten cents per acre ; that he, the witness, and *Taylor,* on the 6th of *September,* 1795, applied to *Wolcott,* and contracted with him for the purchase of 200,000 acres of the land, at ten cents per acre, paid him the amount of three cents per acre, in advance, secured the payment of the remaining seven cents per acre, to his satisfaction, and received from him, a covenant to procure them a title to the land ; that the plaintiff was present during the negotiation of this contract, to which he was a subscribing witness ; and that during this transaction, no mention was made of any of the former agreements between him and the plaintiff.

Upon this state of the facts, the court instructed the jury, that the plaintiff was not entitled to a recovery, and that

their verdict must be in favour of the defendant : Whereupon, the plaintiff moved for a new trial, on the ground of a misdirection ; which motion was reserved for the consideration of the nine Judges.

*N. Terry* and *T. S. Williams*, argued in favour of the motion.

*Daggett*, contra.

MITCHELL, Ch. J. This action is brought to recover a compensation for services rendered to the defendant. The declaration states, that *Wolcott* had offered himself as agent for such persons as would become interested in the purchase of certain *Virginia* lands, and employ him to effect such purchase, at ten cents per acre. He solicited the plaintiff to undertake to procure individuals to employ *Wolcott*, as agent, and engaged to pay *Huntington* one cent per acre on all the lands which he would either take, or procure to be taken, on the terms stated ; provided the same should amount in the whole to 100,000 acres. It was then stated, that he did take, or procure to be taken, the necessary number of acres to entitle him to his commission.

It was agreed, and proved, on the trial, that the proposals of *Wolcott*, and his agreement with the plaintiff, were correctly stated in the declaration ; and to establish the other facts alleged, the testimony of a witness was introduced, as recited in the motion. The court, after recapitulating the evidence, declared to the jury, that they were unanimously of opinion, " that the facts did not entitle the plaintiff to a recovery, and that their verdict must be in favour of the defendant."

This motion is founded on the illegality of this charge. The most material question which arose on the trial, was, whether the contract, by which *Wolcott* sold to *Coleman* and *Taylor*, certain lands, was made by the procurement of the plaintiff, so as to entitle him to his commission of one cent per acre, agreeably to the contract previously entered into

by *Wolcott ?* If any evidence of this fact, was adduced, on the part of the plaintiff, it was within the province of the jury to determine how far it tended to establish the point to be proved.

It has been insisted, that the evidence conduced to prove a contract with *Coleman* alone, whereas, the contract in question, was made with *Coleman* and *Taylor*. A little attention to the testimony, will shew what foundation there may be, for the assertion.

To shew his agency in procuring the contract ultimately made with *Wolcott*, the plaintiff proved the execution of two agreements, in *August*, 1795, to which he was a party, and which he contended, (as the second was made on the same day, and immediately after the first, between the same parties, and respecting the same subject matter,) might, and ought to be considered, and regarded, as one entire contract, in which *Coleman* bound himself to purchase of *Wolcott* 100,000 acres of land, at ten cents per acre, and 100,000 acres at eleven cents per acre; one cent on each acre of which, was payable to the plaintiff. For although, in *Coleman's* indenture, he had stipulated to pay twelve and an half cents per acre for the whole tract; yet, by the other writing, executed immediately afterwards, *Huntington* engaged to demand not more than ten cents per acre, provided *Coleman* would pay to him, one cent more per acre for one half of the tract; so that, with respect to the sale of 100,000 acres, which was the amount necessary to be sold, to entitle *Huntington* to his commission, the contract was finally made agreeably to the terms specified in *Wolcott's* proposals, and within the scope of the plaintiff's authority. The other 100,000 acres were to be sold at the same price, by *Wolcott*, on condition, that *Coleman* would reward the plaintiff with one cent per acre.

It is apparent from the proof, as stated in the motion, that *Huntington* first applied to *Coleman*, and gave him information of *Wolcott's* proposals to furnish the lands at ten cents per acre, and that in consequence of this information, and a certain agreement entered into between *Huntington* and *Cole-*

*man, Coleman* immediately set out for *Boston,* with a view to raise money wherewith to make the purchase, and carry the agreement he had made with *Huntington,* into effect ; and having associated with himself *John Taylor,* they procured the sums necessary to be immediately advanced, and thereupon, repaired to *Hartford,* where a contract was made with *Wolcott,* for 200,000 acres of land, at ten cents per acre. Thus, a journey was commenced and completed, a partner was admitted, money was raised, and an interview with *Wolcott* took place, all in consequence of the steps taken by *Huntington,* and, of course, by his procurement.

On the meeting of the defendant with *Coleman* and *Taylor,* at *Hartford,* terms were agreed on, and a contract made for the purchase of 200,000 acres of the land, if it could be procured by *Wolcott,* and at ten cents per acre.

Hence, it appears, there was, at least, some ground for the jury to presume, that the ultimate agreement was effected, by the agency and procurement of *Huntington,* who, as it appears by the testimony, was present at the execution of the contract, and a subscribing witness thereto.

The admission of a partner with *Coleman,* could not affect the claim of *Huntington.* *Wolcott* must be presumed to be benefited thereby, as his security was increased. But if this would release him from his engagement to the plaintiff to remunerate him for his trouble and expence, he would have had it in his power to defeat *Huntington* of his right to his commission, by taking additional security, in every possible case of the plaintiff's procurement ; and yet, avail himself of the plaintiff's exertions.

For a similar reason, the plaintiff's claim ought not to be affected by a variance in the terms of the final contract, from those stipulated with *Huntington,* since a contrary principle would place it in the power of *Wolcott,* by slightly altering the concluding contract, to deprive the plaintiff of what he might be justly entitled to, for his services, according to the agreement.

It is immaterial, whether all the instalments have been paid or not, for if it be admitted, that the plaintiff's reward

was to become due only when the price should be paid, according to the construction given by the defendant ; still, other objections being removed, the plaintiff could fairly claim a part of his commission, as soon as any payment was made ; that is, he would be entitled to recover such proportion of it, as the money advanced bore to the price of the whole tract of land.

Upon this view of the subject, it cannot be denied that there was some evidence adduced, of the plaintiff's agency in procuring the sale in question, and of a benefit received by the defendant thereby ; which, according to the fair import of the agreement between them, entitled the plaintiff to a compensation. The weight of this evidence, and the degree in which it tended to establish the fact in dispute between the parties, was peculiarly within the province of the jury to determine.

It is contended, that the plaintiff, in his negotiation with *Coleman*, was guilty of a fraud, (which is apparent in the testimony recited,) and which would justify a verdict against him. It is difficult to perceive wherein the fraud consisted. It was, surely, optional with him, either to allow or refuse *Coleman* the opportunity of the speculation. The plaintiff was sent out by *Wolcott* to procure individuals to make him their agent, to obtain for them *Virginia* lands, and to engage to pay ten cents per acre, for such quantity as they should agree to take ; and it was matter of no moment to *Wolcott*, who they might be, if they complied with his terms. The plaintiff was under no obligation to disclose the lowest price, or terms, on which the land could be procured. Cases of this sort occur daily, in the commercial world, without any imputation of fraud : As, where agents and factors are authorised to dispose of property at a particular price, and yet, do not hesitate to demand a greater one, if the market will warrant it. But the plaintiff, in this case, was empowered only to hunt for purchasers, and *Wolcott* was left to make his own bargains. If *Coleman* was induced to enter into the agreement with the plaintiff, on the 28th of *August*, 1795, by any false or fraudulent representation, that agreement might, thereby,

*Nov.* 1812.

HUNTINGTON
*v.*
WOLCOTT.

be invalidated ; but the defendant could not avoid his contract with *Huntington*, because he had been guilty of a fraud in a contract or agreement made with a third person, when he, *Wolcott*, had not been injured thereby. It might as well be pretended, that the same transaction contaminated, and rendered void, every contract to which the plaintiff had, at any period of his life, been a party.

The contract now in question was made in good faith, and claimed to have been fulfilled on the part of the plaintiff. To avoid the force of this contract, by proving a fraud in another contract, with a different person, would be novel and unprecedented.

I am of opinion, that a new trial ought to be granted.

SWIFT, BRAINARD, BALDWIN and INGERSOLL, Js., concurred in this opinion.

SMITH, J. It seems, that *Wolcott* issued public proposals, offering himself, as agent, to procure certain *Virginia* lands, at ten cents per acre, a small sum to be advanced, and the remainder to be paid by certain instalments : And in case of failure, to return the money advanced, and lose his own time and expences. He then makes a contract with *Huntington*, counting on these proposals, which were then public, and well known to the parties ; in which *Wolcott* agreed to allow *Huntington* one cent per acre, out of the ten cents, for all the lands he would either take himself, or procure to be taken, provided it should amount to 100,000 acres.

On the last mentioned contract, the present action is brought ; and the question of fact, before the court below, was, whether *Huntington* procured *Coleman* to take a certain quantity of land, within the meaning of the contract. The evidence to establish this point, consisted in certain written contracts, and the testimony of *Coleman*. This evidence the plaintiff introduced, and there was no opposing testimony. The court were of opinion, that the facts thus disclosed, even allowing all the facts to be fully proved, about which *Coleman*, the plaintiff's own witness, testified, did not lay

Nov. 1812.

HUNTINGTON
v.
WOLCOTT.

any foundation, in point of law, for a recovery. They, therefore, saw nothing to be left to the jury; but instructed them that their verdict must be for the defendant.

This record presents the following questions for consideration.

1. Did *Huntington* procure *Coleman*, or *Coleman* and *Taylor*, to take the lands in question ? If he did, then,

2. Has the money been so paid, and the land so received, as to entitle the plaintiff to his action ? If the plaintiff has failed, on either of these grounds, then the question arises,

3. Has the court so encroached upon the prerogative of the jury, as to entitle the plaintiff to a new trial ?

These questions will be considered in their order.

First, then, did *Huntington* procure *Coleman*, or *Coleman* and *Taylor*, to take the lands in question, within the meaning of this contract ? To decide this question intelligibly, we must first determine what the parties meant, by procuring persons to take the lands. Could they mean, that *Huntington* should be entitled to his premium, whenever he was the remote cause of a contract, without any direct agency ? Suppose *Huntington* had procured a man to come to *Hartford*, on other business, who, after he arrived, heard of *Wolcott's* proposals, and, immediately, applied to him, and made a contract ; and suppose it should be rendered highly probable, from various circumstances, that if he had not come to *Hartford*, he would never have heard of *Wolcott*, or his proposals. In such case, *Huntington* would have been a remote cause of the contract ; but will it be seriously said that he procured it, within the meaning of this contract ? Or, suppose a person in company, should have heard *Huntington* state to another, *Wolcott's* proposals, and without any communication with *Huntington*, had applied to *Wolcott*, and made a contract, would this have been a procurement, within the meaning of the parties ? Or, suppose *Huntington* had applied to a man, and stated to him fairly *Wolcott's* proposals, but, afterwards, under pretence, that the lands were rising, had demanded twelve cents per acre, and by this means, had broken off the

negotiation, and the same man, had, afterwards, applied to *Wolcott,* and made a contract, would this have been procuring a purchaser to take the lands ? It appears to me, very clearly, that it would not ; although, in this case, as in the others, which I have put, *Huntington* would be a remote cause of the contract. The question, then, recurs, what was their meaning ? To me, it is perfectly obvious, that *Huntington* was to be entitled to one cent per acre, on all the land he should either take himself, or agree with others to take ; or procure others to take, by any agreement, or contract of his.

Having settled, what I consider to be the meaning of the parties to this agreement, I would now enquire, what *Huntington* has done on this subject, and if it shall turn out, on investigation, that all he has done was void, and, in point of law, a mere nullity, then, I think, I may safely conclude, that in law he has done nothing. I would here remark, that the contract was finally closed between *Wolcott* and *Coleman* and *Taylor,* and as to *Taylor,* there is not a pretence, that *Huntington* did any thing, to induce him to purchase. What he did to procure *Coleman,* appears of record. He first stated *Wolcott's* proposals fairly to *Coleman,* but no agreement was then made. He, afterwards, acting in the character of agent to *Wolcott,* declared, that he could not sell the lands short of twelve and an half cents per acre ; and a contract was closed on these terms, signed by *Huntington,* as agent to *Wolcott.* He, soon after, varied this contract, by giving up the two and an half cents per acre, which he had contracted for, over and above the ten cents, and took one half cent per acre to himself, in the room of it ; and this agreement he did not sign as agent, but acted for himself.

Here we stop ; for let it be remembered, that this is all which *Huntington* did, that can be claimed, with the appearance of plausibility, to be a procurement. He, indeed, came to *Hartford,* afterwards, but it does not appear, that he did any thing there, not even to disclose what he had done, before it became unnecessary to enquire what would be the rights

of the parties. Besides, *Huntington*, at a subsequent period, contradicted his first information, by declaring, that the lands could not be sold as he first said they could ; and it seems, that *Coleman* never learned the truth on the subject, till he learned it from others, at *Hartford*. If, therefore, *Huntington* has done any thing, which can be called a procurement, within the meaning of the parties, it must be found in one, or the other, or both of the agreements I have mentioned. Do we find it in the first ? In this, he appears as the agent of *Wolcott*, and in his name, declares, that he cannot sell the lands short of twelve and an half cents per acre ; and in confidence of the truth of this assertion, *Coleman* makes the contract ; when the principal was holding out his public proposals, at *Hartford*, and contracting with every body else, at ten cents ; and *Huntington*, himself, had no other instructions from *Wolcott*, than to contract at ten cents per acre.

It does not need a moment's consideration to see, that the false affirmation which produced this agreement, renders the whole void ; and that it laid *Coleman* under no obligation whatever. Do we find the after agreement, which varied, and modified the first, any better ? Had *Huntington* thrown out the two and an half cents per acre, altogether, it might have purged the fraud contained in the first agreement, as to *Coleman* ; but we find him still, under pretence, that the lands could not be sold at ten cents per acre, retaining a part of it. This contract, then, is as fatally fraudulent, in respect to *Coleman*, as the former. And it does not place the subject in any fairer point of light, that we discover in it, a design to defraud *Wolcott* also, for whom the first agreement was made by *Huntington*, as his agent. If, indeed, it was a valid contract, the principal had a right to the full benefit of it, and any attempt to give up a part of it, on an agreement to take a smaller sum to himself, must be a gross fraud on the principal. I feel perfectly satisfied, therefore, that neither the agreement as first made, nor after the modification, had any validity in it.

But further, this species of speculation, in which *Hunting-ton* engaged, was a departure from his agency, and altogether unauthorised by the agreement between him and *Wolcott.* The proposals which were issued, related merely to an agen-cy. *Wolcott* expressly disclaims all idea of becoming pur-chaser and seller, for himself, but insists, in one event, on the right of returning the money advanced. He is willing, for the ten cents, to risk his own time and expences; but means to risk nothing else. In the contract with *Hunting-ton*, he gives him a compensation for his trouble, in the one cent per acre, out of the ten cents. He could not mean, therefore, to authorise any attempt to obtain a farther sum.

I may test this subject, by supposing that *Coleman*, on dis-covering the imposition, had refused to take the land, or comply with the proposals of the agent; and I ask, could either *Huntington* or *Wolcott* have compelled him to do so? Or, suppose *Wolcott* had been informed of the precise manner in which *Huntington* had conducted the business, and had refused to admit *Coleman*, as a purchaser, would *Huntington* have been entitled to his compensation? If he would not, then he is not now; for, surely, *Wolcott*, by his act, cannot defeat *Huntington's* claim to what he is otherwise entitled to.

But it is said, that *Coleman* and *Taylor* actually made a contract with *Wolcott;* and this I admit; but nothing is, however, proved by it, except that they were willing to take it, and that not from any thing which had been done by *Hunt-ington.* They found that *Wolcott* was actually contracting at ten cents per acre, the terms being different from what *Huntington* represented; and finding this to be the case, they, of their own accord, applied to him, and made a contract.

Secondly, has the money been so applied, and the land so received, as to entitle the plaintiff to his action? Nothing appears from the declaration, or in the facts proved, on the trial, to shew, that *Wolcott* had procured the title; or that the lands were not sold, when he arrived at *Virginia;* or that he has received the ten cents per acre, or been entitled to it, from *Coleman* and *Taylor.* But the plaintiff insists, that he

had performed all he was bound to do, when the contract was made by his procurement, and was then entitled to his premium, whether *Wolcott* could procure the land, or not. Whether this is correct, will depend on the construction we put upon the agreement. I have already remarked, that *Wolcott's* proposals were known to the parties, when they made the agreement in question; and they stipulated with an evident view to them. They speak of the ten cents to be paid for the land, and the agreement is, that *Huntington* is to receive one cent out of the ten cents, to be paid for the land; but in one event, the ten cents were never to be paid, and the money actually advanced, was to be refunded, and *Wolcott* was to lose his time and expences in going to *Virginia;* and in the same event, I ask, was not *Huntington* to lose his trouble also? He cannot receive the one cent out of the ten cents, unless the events happen, which shall entitle *Wolcott* to receive it. The parties having placed *Huntington's* right to the one, upon the reception of the ten cents, shows their meaning to be, that he was not to be entitled to this premium on the mere employment of *Wolcott,* as agent, but on the consummation of that agency, and the happening of those events, which should entitle *Wolcott* to the ten cents. If a different construction is to be put upon this agreement, then *Huntington* was entitled to the one cent, for what he took himself, and might have claimed it, the next day, after employing *Wolcott,* as agent; provided he had contracted for a quantity large enough; and *Wolcott* must have paid it to him, although, it was altogether out of his power to obtain the land. This could not be their meaning. They appear, rather, to have in view, a division of the profits of this agency, and count, therefore, on a completion of the business, and a reception of the whole sum.

I do not mean to be understood to say, that *Huntington* would not be entitled to his premium, provided *Wolcott's* right to the ten cents, failed, in consequence of any misconduct, or negligence of his. But if such was the fact, it should have been shewn, and this might have placed the plaintiff's

claim, on as high ground, as though it had actually been received. I mean only to say, that to entitle the plaintiff to recover, he ought to shew, either that the whole sum was received, or that the failure was owing to the misconduct, or negligence of the defendant.

If I am correct on both, or either of these grounds, there ought to be no new trial granted, unless it is done to vindicate the rights of the jury.

This brings me to the third enquiry. Has the court so encroached upon the rights of the jury, as to entitle the party to a new trial in this case ? If I am correct on either of the preceding grounds, it is very evident, that substantial justice is done between the parties ; and on another trial, the cause must be decided the same way. It is difficult for me, therefore, to see what claim the party has to a new trial.

It is within the recollection of every member of this court, that the practice of filing bills of exceptions, was given up, and motions for new trials substituted in their stead, principally, to give the court a sound discretion on the subject of opening a cause, for farther litigation. I should very much doubt, therefore, in this case, whether a new trial ought to be granted ; although it should be thought that the court have gone rather too far, in their instructions to the jury. But I am not yet convinced, that they went too far. Indeed, if I am correct in supposing, that the plaintiff could not recover, without either shewing, that *Wolcott* actually received the ten cents, or that he failed, by his own negligence, or misconduct, there was, clearly, nothing to be left to the jury ; for, on this subject, there was not a shadow of evidence, and the whole case turned on a construction of their written agreement : And the other point becomes unimportant, if I am correct in this. If, however, I am incorrect on this point, then the cause would turn upon the question, whether the plaintiff procured *Colcman* and *Taylor* to contract with *Wolcott*, within the meaning of their agreement ? And this is claimed to be a question of fact. It is rather a mixed question of law and fact. The construction of the writing,

is matter of law ; when that is ascertained, what remains is matter of fact. I admit, most fully, however, that it was a question for the jury to decide. They were the only forum which could decide it ; and they found a verdict accordingly. The court instructed them, how their verdict ought to be, taking the facts even as claimed by the plaintiff, appearing by certain written agreements, by him produced, and by the testimony of his own witness ; and, in this, I cannot think they did amiss.

In an action of *trover*, where the only question is, whether there had been a conversion ; and it should be agreed, by the parties, that there had been a demand and refusal ; although, still, the conversion is matter of fact for the jury to find ; yet, I should think it no great encroachment on their prerogatives, for the court to inform them, that their verdict must be for the plaintiff. So again, suppose the plaintiff, in attempting to prove a demand and refusal, by his own witness, proves only a demand, but so far from there being a refusal, the same witness proves, that the defendant offered to give up the property in question ; may not the court instruct the jury, that taking the facts to be true, as sworn to by the plaintiff's own witness, there must be a verdict for the defendant ? Of course, there is nothing for them to consider.

But it has been said, that at least, the court should have submitted to the jury the credibility of the plaintiff's witness. They then, on this ground, must have stated to the jury, that if they believed *Coleman*, the plaintiff's witness, their verdict must be for the defendant. And what if they did not believe him ? Then, in that case, their verdict must be the same. Whether the witness was to be believed, therefore, was altogether a useless enquiry.

If, in the opinion of the court, the facts disclosed by *Coleman*, were sufficient to entitle the plaintiff to a recovery ; then whether he was to be believed, or not, must have been submitted to the jury. But there cannot be a verdict for the plaintiff, on the ground, that his own witness is not to be

Nov. 1812.

HUNTINGTON
*v.*
WOLCOTT.

believed, because, in such case, he is destitute of proof altogether.

In my judgment, therefore, no new trial ought to be granted.

REEVE, TRUMBULL and EDMOND, Js., concurred in the opinion delivered by *Smith*, J.

New trial advised.